Good morning, your honors. I am Keith Clark. I'm the Cosper Run Proposal Counsel for Professor Vinesh Singh. I'm going to talk to you for about five minutes for a proposal. My honors, my client is a Tesla engineer, and he is deported now to Fiji. He will not have the resources to treat his incurable disease known as Valley Fever, which through no fault of his own, he contracted while incarcerated and was killed from the business system. Now I understand the federal government is now responsible for the harm inflicted upon Mr. Singh, which occurred while he was in custody in the State of California. If we're going to enforce Mr. Singh, there's not certain federal government proposals that are indeed valid. Mr. Sessions has a strong legislative recourse on our case. We can evaluate that. But you are claiming this was a government-created danger. Yes. But don't you have the Osama Diploma? It's not the United States that caused it. It was the state. And I don't know how you can possibly fit into this category, since it was, I mean this is just like any other danger. This is just like any other danger. I can re-evaluate some of the laws of that process. Well, he's ineligible for asylum because he's an independent fellow. Well, I'd say that that's his restriction. But I don't see it where this is any different. Well, the difference is that he has had no real opportunity. Well, he actually has had an opportunity, but again, after he left Princeton. But it doesn't matter. I mean, this wasn't caused by the federal government. That's exactly right. You have a story. This is not government-created. This is created by this other entity called the state. However, I think the federal government was given some responsibility when they deported him at this point. Is that true for anyone who has a medical condition that they wouldn't be able to afford to treat? In the place they would be deported to, what's the difference between him and anyone else who has a medical condition who might be deported? Well, you know, the question was, if my apologies drew attention, different jurisdictions, different States, and the United States is proposing to deport this man to Fiji and put him out there with the parties that are dying, and the state of California, you're missing the state of California, causing injury, that's why they're deporting him. They need to offer him for this reason. Well, but that's true for anybody who, you know, this is just a famous question. How is he different than anybody else who, when deported to a country where he can claim to have no adequate medication available? Well, I just find it hard to distinguish the situation from what the prison system did do. But it's not the federal prison system, it's not the United States. It is a state that is in different sovereign, and for lots and lots and lots of reasons, and there are lots of occasions we treat states as sovereign entities. For example, you can be prosecuted for the same conduct, both by the federal government and the state government, without government jeopardy. There's all sorts of reasons that's why we're treating them as different entities. Well, I understand that, Your Honor. I still see how what's happened to him in the states is different than if he had gotten the illness by consorting with people who had the illness in Liverpool by doing drugs, you know, dirty needles and all that. He just contracted the disease somewhere else. Well, I think it's quite a substantial difference in the facts. The D. Valley fever disease spread amongst, particularly, I think, people of Asian descent and others like him, South African-Americans, while they were in California state prisons. Obviously, as you know, there were a number of cases that he could have sued for that. Well, he could have sued for that, and he had the opportunity to sue for that. Isn't he still suing for that? He's suing for that, yes, and he's suing for that after he was placed in federal detention. Big question. So if he were to obtain enough money damages in that lawsuit, could he afford the treatment in T.G.? Indeed. But that litigation is still ongoing. So if I lose here today and Mr. Singh is deported and the next thing he needs to feed me, he'll die before he gets those damages. He's a very sick man. And that's my point, is that he was not able to get his claim while he was in state prison. By the time he realized that he didn't have the incurable version of this disease, it was a matter of months before he was placed in federal detention. So has he sought humanitarian relief of any sort through the immigration remedies? I mean, it seems like a very sympathetic case. It seems a very odd form of a claim, and it seems like we have both costs right now. What I disagree with is there's another form of claim that's used in the next claim, and he can now advance and do something about it. But why can't he seek? I mean, are there humanitarian grounds that he can pursue? Well, certainly he can petition to the Attorney General for relief after this case is included. Yes, that is an option for him. I can tell you he's going to get very far with that approach. But he's all right. We're in it. He seems all right. Well, he hasn't tried it because first of all, there's a petition for review, and I think this is an option for him. But he would have tried when he filed the petition for review, and he couldn't sought humanitarian relief at that point. Well, I assume there was a different Attorney General at that point. I don't think there was a different Attorney General, and I don't see anything on the record that he did for it because, as you know, I took on this case by appointment after the record was established by the foreign minister. Well, I'm not going to listen to you. Are there any examples of cases in which someone who contracted Valley Fever in a prison had a claim for medical care after release, even if they stayed in this country under the state-created danger doctrine? Well, those cases are all in progress. So are they being litigated as state-created danger, or are they just being litigated as some kind of deliberate indifference, maybe a lack of medical care or something like that? I mean, this state-created danger kind of substitute process form of claim, it's not the typical kind of prison medical care kind of claim, I don't think. Well, yes, and actually in the exact same California case that cited on the record, the plaintiff's criminal judicial punishment, so rather than a surprise case. So I can't cite to a case specifically where the state-created danger doctrine has been implicit in all of these Valley Fever cases. That doesn't mean that the shady spending court case has been established that the state-created danger doctrine has been cited in most of these cases as a grounds for the damages being awarded to these ministers, because it just doesn't seem as if we're, you know, actually not applying to the prison authorities. So it might be a way to get damages, but is it a way to get – I mean, he essentially wants some form of injunctive release, right? So, I mean, is there some kind of injunctive release remedy out of the state-created danger doctrine that's available to prisoners who have contracted a disease in prison? No, they are actually seeking damages for their injury. I am seeking a – we have an injunctive remedy. I mean, it's preferable for whoever's on the bench, but only if the district court mitigation is completed so that you both possibly have damages available to them to take within two weeks. What is the stage of that, their litigation? How long do you think it will take? Well, it might be a final motion for judicial notice, if you have it or don't have it, in which there is currently a case before the 9th Circuit, which was argued and submitted in May. And yes, Mr. Singh, this district case has been stayed until the outcome of that case before the 9th Circuit. Right now, just apparently, I would imagine, there's a decision that will be coming down fairly soon, since those arguments have been made. But stayed in what stage? What stage is the district court case at? Like, if it comes back to life, will it be at the motion-to-dismiss stage, or some regions, or where? Where is it? Well, people tend to question this at this stage. I would say it's somewhat equilibrium there. It's hard to proceed, again, if the 9th Circuit re-adds it back to the district court. So, I suspect it's going to be a while before there's going to be a resolution in that district court case, yes. I think that's my concern, is that, I mean, I am fully aware of the difficulties with my argument here. But I am also very concerned about what happens at this time. And I think it's a little bit more complicated than you think. Does this deal with contracting a disease? And, again, I just think that, yes, it appears that we're a sovereign state, but this is the United States, the federal government, by now, deporting him. As I say, I think perpetuates the harm that he incurred while he was in the district court. Has there been any attempt to mediate this case? No, I'm sorry. Would you be interested in that, if it was a consular? Yes, I would be. Thank you. I'd like to reserve the rest of your time for consults. Oh, consults. What do you think of the government's attempt to undermine your reliance on Morgan versus Gonzales? Well, I mean, I think the Morgan-Gonzales is still valid. I mean, yes, it occurred right at the transition point of the real Indian Act, and, therefore, it was restarted in this district court, and then it was transferred to the 9th Circuit. But now, I mean, they're still having you released, and seeing as is the 9th Circuit, then I think Morgan opens the door for substance abuse process to be considered irrevocable. So I think that decision, that opinion, still is valid. I think the analysis is the same, whether you started in the district court and transferred or whether you started in the circuit court. Thank you very much. Any other questions? Okay. We'll hear from the governor. Mr. H.C. Starr. Victor Lawrence on behalf of the Attorney General. It's just, Mr. Lawrence, do you think maybe the Attorney General could figure out how to generate a table of contents that actually includes the cases you are doing your briefs on? My apologies if that didn't happen. Well, it didn't happen. I'm not sure you got it to work. It's not listed in your table of attorneys, and you discussed it in numerous places in your brief. How does that happen? Your Honor, as you may be aware, I was not the person that prepared the brief. I think it's a really good idea that you go into the usual Toronto office and engage them. You obviously look at your brief very carefully. I have, if not, said that you'd be satisfied with it. Honestly, Your Honor, I don't usually look at the table of contents. I look at what's in the content of the brief. Well, I look at both. Your Honor, I was trying to find where you were talking about Mark. I do apologize. Well, that can't be your discussion of Mark. I thought it was a pretty capable attempt to distinguish it. That's right. Are you going to put him into an attorney's room and look at what's going to happen to him? The author of the prepared brief no longer works with us immigration and immigration law. She has moved to another position with the federal government. Are you saying you're going to bring him to an attorney's room and have a person supervise him? I will, Your Honor. Yes, Your Honor. Oh, I see. You want me to bring it to the attention of the drafter of the brief's supervisor, please. I get asked how I can do that. Your Honor, I don't know who that person is. Mark, why don't you talk to your solicitor and see if there's a problem with you? I'm sorry, Your Honor, I'm sorry. Is my memory correct? I would ask that you listen to that, Your Honor, and I do apologize on behalf of my office. You'll file a correct brief. If Your Honor wishes, I hope you will. Do you want to say anything else, Your Honor? Yes, absolutely. Okay. So, I'm sorry, Judge Bennett, you had a question about a U.S. person not working for us? No, no, no. That's the one sentence that Mark stated in the introduction. He may also be invoked to enjoin deportation. Yes. Can you just state what that statement is? Yes. Well, that is what we said in the brief, Your Honor. But here's what I would say. In Wang, which was the original case in the Ninth Circuit, that case did invoke the state creative data in the introduction in order to enjoin removal under the specific facts in Wang. Now, if you look at footnote 16 of Wang, in my view, it makes it clear that it's based on the particular facts that the court found substantive due process to make in that particular case. And I think when the Oregon court reviewed Wang, they did so by suggesting that, well, in any case, there could be a state creative data. And I would dispute that that's really the case, and I think that's why we say it's dicta. Because in Wang, it was done on the specific facts that make that case. In Oregon, they suggest, yes, that back in 1996 in Wang, we did find a state creative data introduction. However, so this is why the government suggested that it's dicta. But nevertheless, I urge the court to follow Morgan in this sense. In Oregon, the court found that there's not a comparable due process claim. And here again, for the reasons the court mentioned in Washington Post and Counsel, there's not a comparable due process claim. The affirmative misconduct was not by the federal government in relation to the state creative data introduction. The affirmative misconduct, to the extent there was, wasn't handled by making a judgment on that. It was done by the state of California. There's no brevity between the two. In every case that you found a state creative data introduction which specifically pointed to Wang, there was significant factual analysis about how the federal government was involved in a courageous affirmative misconduct. That is not here at all. And therefore, if the court did follow the court's opinion in Oregon, which my apologies again for not being able to take more content, but if the court did follow the opinion in Oregon and went straight to the due process issue and to see if there's really a comparable claim of substantive due process violation here, we suggest that the court would not find a comparable due process claim because the federal government engaged in no affirmative misconduct. But it's not disputed, right, that he contracted this disease while in California prison? We are not disputing that. So it's a pretty sympathetic situation even if the federal government is not responsible for it, and it wasn't his fault, right, that he got this disease in California prison and it seems that he will probably die when he is deported from this country. Well, Your Honor, I cannot submit to this that that is the facts that are alleged by my attorney and his priest. Whether or not he is actually in that before a physical condition that when he is moved to Fiji, he has a possible way of dying, I don't know whether that's true or not. But again, I don't think it matters, and I know it means it sounds not as authentic in this case. But just as Your Honor pointed out about what's the difference between this and a regular asylum claim where an individual is very sick and might be deported to a country, the federal government didn't cause the individual to be sick, and we're not perpetuating, or I believe that was the word my opposing counsel used, we're not perpetuating any harm by deporting him. We're only engaging in the federal government's fundamental sovereign attribute to be able to remove aliens who are illegally here in the United States. And the fact that he may be in that condition is not the fault of the federal government. Is there humanitarian relief that he might be eligible for? So we pointed out in our brief that under EC 4241.6 there's an avenue for you to request humanitarian relief. And frankly, in the recovery, my opponent simply says that the prospects of relief under that are dim, was the word he used, without even trying, and there's nothing that prevented them from trying months ago to request humanitarian relief. And that just hasn't been done, at least to my opposing counsel's assistance, and I'm not aware of it having been done on our end either. So yes, there is that avenue where you could request that. He hasn't done so, and therefore I think that is a moot issue. Mr. Lawrence, did I miss something on the medical records? I didn't see anything that would indicate that if he wasn't able to take the medication, he would die. Maybe I didn't read the medical records carefully enough. Is there a reasonable inference that one could draw from this record? From my review of the record, I was not able to draw the reference that he would die if he was removed to Fiji. Is that in response to the question? Yes. So, very simply, Your Honor, I think if the court did follow the court's opinion in Morgan and jumped straight to the due process issue and found that there wasn't a solvable claim, the court could easily deny the petition for review. And, you know, we also argue that the state-created danger doctrine is not available in this circuit, which is a tougher argument, I can see, but we do so based on the phrasing in Wang, which suggests that he was falsely indicted. There was particular facts in that particular case. And again, in Oregon, what we believe to be educating in Wang, the state-created danger doctrine was accepted in the previous case. So, I think the better reason here might be to follow the courts in the First and Third Circuit, which found that there was no jurisdiction in the justice entity process for this particular claim. Well, in those cases, the court went off on a separation of powers argument, and that's, I believe, absent from both Wang and Morgan outside of the call. Right. And, Clark, I guess that to you could be very true, Your Honor. I did not recognize these two I guess roughly raised here, I'm afraid. Possibly not, but I could be You know what, in Wang, also, there's another critical distinction in that in Wang, the government had not yet implemented the Convention Against Torture. And, which is available now, and of course, Micronet has waived the claim under the Convention Against Torture, as well as any dictum on how the asylum has been unfolding. But in Wang, the Convention Against Torture was not in place yet, and this wasn't implemented through regulations. So, at that time, that petitioner who really did have the possibility of being tortured or punished in New Orleans, China, did not rely on a claim of protection under the Convention Against Torture. However, this thing was not in that position. I think that's another critical distinction between what's going in this case might have been before in Wang. That wasn't true at the time Morgan was decided, though, right? Right. So, I have Morgan was decided that the Convention Against Torture was held in Morgan, and so that they, it was assumed that it's degraded danger. Doctrine was available. Jump straight to the due process, they do, and it analyzes whether there was a colloquial claim. There, there was an issue of whether or not... But if Kat had overruled Wang, then Morgan wouldn't have made that assumption, right? I mean, if it's so obvious, then Fred should particularly have had statutes superseded Wang. Well, I, I, of course, we have to take issue with the words that have superseded Wang. I'm just saying that that alternative method of protection, the claim under Convention Against Torture was not and that wasn't in Wang. Right, but so Wang exists and we're bound by the existence of Wang unless something superseded it or got rid of it, but we don't have an opposition getting rid of it, so it seems that the only thing that can get rid of it is the Kat statute, and that seems not to have been Morgan's assumption. Okay, or, or did Morgan rely on the 16 of 17? I mean, that didn't mean that this could create a danger to the doctrine of social safety process, at least for now. It just wasn't available in the fact-critiquing under case, given the fact that the government forces trying to come to the country and testify and... Right, but so then you can argue on the merits that this is a dozen regions or something, but that doesn't mean it's not available in theory on some sets of facts. So, I can see, Your Honor, that it's a tough argument to say that it's unavailable at all, and it's our preference that the Court look at the First Circuit's opinion in Bonneville, and the Third Circuit seems to have our input that it's not available. But we would have to go on bonds to do that, I think. Okay, so, in that case, I think that the better course of action, perhaps, is to straight to the due process claim, realizing there's not a culpable due process claim here, that the fraud and misconduct was by, if anybody, by the State of California, not by the federal government. We're doing nothing to perpetuate that harm, and therefore, it really doesn't matter whether we're involved in the creation of this conduct. The reason for this conduct, in the first place, of course, is the claim of deliberate interference within the California prison system for allowing individuals to contract value fever. The federal government had nothing to do with that. As a result, this individual, unfortunately, cannot rely on the State-created danger doctrine to the extent that it exists in the circuit. Do you think there would be any value in maintaining this case? I really don't, Your Honor. Of course, if that was the request for us to engage in mediation, of course, we would honor that, but I don't see that there's an in-between line here. These cases are, again, prosecutorial discretion, but this is a case that the government determined this individual was an aggravated felon. He attempted to kill somebody. Of course, he was convicted of the corporal injury to his live-in girlfriend, and he was an aggravated felon. He was also a permanent resident, but now, as a result of being an aggravated felon, he's reposed in the United States, and that's when the government ceased to care. Mr. Lawrence, you invited me on some other context in which a separation of powers argument precludes the court from interviewing the process issue. Well, yeah, what's the case in Obama as well as Camaro and so on? Yeah, I'm talking about other contexts. Other contexts in which? Outside of immigration, where courts are precluded from reaching into the process issue because of the present separation of powers issues. Offhand, Your Honor, I can't come up with any examples, but I would suggest that immigration is ingrained in our Constitution as a fundamental sovereign attribute to be able to remove aliens, and in this context, given the reasons provided, for example, by the First and Third Circuits as well as the Tenth Circuit, that this Court would well be within its power to rule that, but I also understand that in the way the decision is available, should you determine that there is a degree of danger or possibility that could be brought in the Ninth Circuit, again, it goes back to the due process issue. There's no culpable due process claim here, and for that reason, the petition for review should be denied. Thank you. Thank you very much, Your Honor. Thank you. Okay. Thank you. We are asking for a referral of the defendant against the basis of our claim as a substantive constitutional issue, and the argument being that he's in the midst right now of a due process before the District Court, which has not yet been completed, and it will be short-circuited. His rights will be short-circuited if he is acquitted now. The question of whether he will die in Fiji demand is very simple. On the record, he had already developed a long tour. He was already on a briefing machine. His testimony in the Immigration Court about his condition was that he needed this fungal, anti-fungal medication on a pretty constant basis. In fact, they took him off that medication. His condition reverted back to the severity that it had had before. He has to be tested. Right now, at the Midwest County Detention Center, he is being tested periodically for the level of the fungal content in his blood. The defendant himself is regulating how much of this fungal cortisol he should have. Fiji does not have any of these resources. They don't even have a little ton of cortisol. We couldn't print out the record. It costs $10 a day and I'm granted. Now we're getting into circumstances that really have nothing to do with the processes for the humanitarian aspect. It has an overwhelming median issue. My objective, when I took this case and saw the record, was to defer removal one way or another so that the man has a chance to at least get damages when he is deported. I'm granted that the statute is clear that he is eligible to be deported. His condition is such that I can't prove he would die, but I think it's pretty clear he would be in a very tough situation where whether he would be able to ever get those damages before they are awarded is, I think, very unquestionable if he's in Fiji. Whereas he stays here at least for the duration of his life, and I certainly will petition for humanitarian relief in Fiji in general. I thought that would be something appropriate to do at the end of these proceedings. I'm not going to be very good at that, but I wanted to see if I wanted to try to mitigate his rights here. It sounds like the government thinks that you could do that now, though, so it seems that that might be a fruitful exercise. I assume it might very well be, but I don't know if that's something intentioned on, I hope, people that defer removal until I can get that forth. I mean, if you're going to try to get humanitarian relief, obviously, if you deny his petition, then he's going to get deported immediately, let's say. Okay, thank you. I'm also sorry to be so disrespectful, but I'm going to go. Thank you very much.
judges: Kozinski, Friedland, Bennett